IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AMERICAN REGISTRY OF | ) | |
| RADIOLOGIC TECHNOLOGISTS, | ) | |
| | ) | CV. NO. SA-12-CV-00109-DAE |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DIANE BENNETT, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court tried this case without a jury on June 27, 2013 and

June 28, 2013.  Shari L.J. Aberle, Esq., and Meghan E. Lind, Esq., appeared

at the hearing on behalf of Plaintiff American Registry of Radiologic

Technologists ("ARRT" or "Plaintiff"); Diane Bennett ("Defendant")

appeared pro se.

Plaintiff initially filed suit against Defendant and her company,

Limited X-Ray Licensure Course Providers, LLC, in the United States

District Court for the District of Minnesota on April 22, 2009.  The United

States District Court for the District of Minnesota concluded that it lacked

personal jurisdiction over the Defendant, and on September 19, 2009

transferred the case to this Court (see The American Registry of Radiologic Technologists v. Bennett et al., Case No. SA-09-CV-00767-XR).

On August 30, 2010, Limited X-Ray Licensure Course Providers, LLC, filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code (see In re X-Ray Licensure Course Providers, LLC, Bankr. Case No. 10-53275-LMC), and on September 2, 2010 Defendant followed suit (see In re Diane Bennett, Bankr. Case No. 10-53388-LMC). Pursuant to 11 U.S.C. § 362(a), the Court ordered all proceedings in case number SA-09-CV-00767-XR stayed pending resolution of the bankruptcy proceedings.

On December 13, 2010, Plaintiff filed a Complaint against Defendant in the Bankruptcy Court, thereby initiating an adversary proceeding (Adv. Proc. No. 10-05137-LMC). Plaintiff alleges that Defendant obtained access to its copyrighted examination questions by asking students she taught through her company to send her questions they saw on ARRT examinations, which she would then send to other students preparing to take the examination. Plaintiff asserts causes of action for copyright infringement, breach of contract, tortious interference, and misappropriation of trade secrets. On February 1, 2012, the case was withdrawn to this Court pursuant to 28 U.S.C. § 157.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because it arises under the Copyright Act of 1976, 17 U.S.C. § 101 et seq. The Court has jurisdiction over Plaintiff's claims for breach of contract, tortious interference, and misappropriation of trade secrets pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witnesses, and ascertained the probative significance of the evidence presented. Upon consideration of the above, the Court finds the following facts by a preponderance of the evidence, and in applying the applicable law to such factual findings, makes the following conclusions of law. To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact. See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.      FINDINGS OF FACT

**The Parties**

1.      Plaintiff is a Minnesota nonprofit organization established in 1922 that, among other things, develops and administers examinations for individuals seeking certification in several fields of medical radiologic technology.

2.      In addition to developing and administering examinations, Plaintiff is a credentialing organization, and maintains a registry of ARRT-certified radiologic technologists. To obtain ARRT certification, an individual must graduate from an approved educational program, agree to comply with certain standards, and pass an ARRT certification examination.

3.      Defendant is a citizen of the State of Texas residing in Adkins, TX.

**The Examinations**

4.      Two ARRT examinations are at issue in this case: the Limited Scope of Practice in Radiography Examination ("Limited Scope") and the Bone Densitometry Equipment Operator Examination ("BDEO") (collectively, "the Examinations").  Plaintiff began offering the Limited Scope examination in 1985 and the BDEO examination in 2003.

5.    Bone densitometry equipment operators use x-rays to measure bone density.  Bone density scans are used to diagnose and assess the treatment or progression of osteoporosis.

6.    Radiography involves the use of x-rays to obtain images used to diagnose illness and injury.  The Limited Scope examination offers certification in radiography of a specific anatomical area.  Thus, by taking the Limited Scope examination, an individual can become certified to perform, for example, chest x-rays, or spine x-rays, or x-rays of the extremities.

7.    Every Limited Scope examination contains certain core questions, as well as questions relating to the "module" the examinee has applied to become licensed in: chest, spine, extremity, etc.

8.    The questions that appear on any particular ARRT examination are drawn from a much larger pool of questions maintained by Plaintiff (Plaintiff's "Test Item Bank").

9.    With respect to the Limited Scope examination specifically, Plaintiff offer three different examinations per year, and draws from a pool of approximately 1,100 questions.

10.    Questions are used repeatedly in successive years, as well as across multiple examinations in the same year.  This repeated use of

5

questions serves two primary purposes: (1) it ensures continuity in test

difficulty and (2) it ensures comparability of scores between candidates

completing the Examinations at different times.

11.     Plaintiff carefully protects the confidentiality of its questions.

Examination questions are not released or made available to the public.

Even within ARRT, access to the questions is restricted.

12.     Plaintiff obtained a copyright in the Test Item Bank from which

its questions are drawn.  Plaintiff also registered its copyright claim with the

United States Copyright Office and obtained a Certificate of Registration.

13.     States contract with Plaintiff to use the Limited Scope and

BDEO examinations as state licensing examinations.

14.     Twenty-eight states require individuals to obtain a license in

order to practice limited scope radiography.  Two of those states—

Mississippi and Washington—do not require limited scope licensees to take

any examination.  Of the twenty-six states that require prospective limited

scope licensees to take an examination in order to obtain a license, twenty-

five contract with Plaintiff.[1]  Only one state, Ohio, offers a non-ARRT

limited scope examination.

---

[1] The 25 states that contract with Plaintiff to use its Limited Scope
examination for state licensing purposes are: Arizona, Arkansas, California,
Colorado, Delaware, Florida, Illinois, Indiana, Iowa, Kentucky, Maine,

15.     Every state that requires an examination to obtain a bone densitometry equipment operator license uses Plaintiff's BDEO examination.  Currently, fifteen states use Plaintiff's BDEO examination for state licensing purposes.[2]

16.     Plaintiff has limited contact with state licensing candidates. Each candidate applies to his or her state for licensing.  The state then submits the names of applicants eligible to sit for the licensing examination to Plaintiff.  Plaintiff provides eligible applicants with an Examination Handbook, which contains information regarding scheduling the exam, test center procedures, and detailed specifications describing the content of the examination (the "Content Specifications").  (Pl. Exs. 8a-8c, 9a-9c.) Plaintiff administers and scores the examination, and then reports the number of questions each candidate answered correctly to the state licensing agency.  The state licensing agency then notifies candidates of their examination and/or licensing results.

17.     To protect the confidentiality of its questions, Plaintiff requires candidates to enter into a non-disclosure agreement.  Before beginning the

---

Minnesota, Montana, Nebraska, New Jersey, New Mexico, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia and Wyoming.

[2] Arizona, California, Colorado, Delaware, Illinois, Kentucky, Minnesota, Montana, Oregon, South Carolina, Tennessee, Utah, Virginia, West Virginia, and Wyoming.

computerized examination, candidates are presented with a screen entitled

"Non-Disclosure Agreement and General Terms of Use for ARRT

Examination Programs."  (Pl. Ex. 1.)  The Agreement provides:

> This exam is confidential and is protected by trade secret law.
> It is made available to you, the examinee, solely for the purpose
> of assessing qualifications in the discipline referenced in the
> title of this exam.  You are expressly prohibited from
> disclosing, publishing, reproducing, or transmitting this exam,
> in whole or in part, in any form or by any means, verbal or
> written, electronic or mechanical, for any purpose, without the
> prior express written permission of ARRT.

In order to proceed to the examination, candidates must click a button that

states: "I accept the terms of this agreement."  (Id.)

### Defendant's Conduct

18.     Defendant applied for and obtained ARRT certification in

Radiography in 1993 and Bone Densitometry in 2001.  Defendant registered

her certifications with ARRT and annually applied to renew those

registrations.

19.     Each time Defendant renewed her registrations, she signed

Plaintiff's Application for Renewal of Registration (the "Application"). The

Application requires registrants to sign below the following statement:

> The terms and conditions set forth in the "Agreement of
> Applicants for Renewal of Registration" section of the ARRT
> Rules and Regulations provided to me are hereby incorporated
> in and made a part of this Application by this reference as fully
> as though the same were set forth in full in this place, and by

8

signing this Application in the space provided below, I hereby
consent to, and agree to be legally bound in all respect by each
and all of such terms and conditions.

(Doc. # 47, Aberle Declaration, Ex. 30.)

20.     By signing the Application, Defendant agreed to be bound by

all terms and conditions contained in Plaintiff's "Governing Documents."

Plaintiff's Governing Documents include Plaintiff's Standards of Ethics.

21.     Plaintiff's Standards of Ethics prohibit registrants from

engaging in "conduct that subverts or attempts to subvert ARRT's

examination process," including: (1) "having unauthorized possession of any

portion of or information concerning a future, current, or previously

administered examination of ARRT;" (2) "disclosing information

concerning any portion of a future, current, or previously administered

examination of ARRT;" (3) "reconstructing (whether by memory or

otherwise) . . . or transmitting any portion of examination materials;" (4)

"using or purporting to use any portion of examination materials which were

obtained improperly or without authorization for the purpose of instructing

or preparing any applicant for examination;" and (5) "disclosing what

purports to be, or under all circumstances is likely to be understood by the

recipient as, any portion of or 'inside' information concerning any portion of

a future, current, or a previously administered examination of ARRT."
(Doc. # 47, Reid Declaration, Ex. 9.)

22.    In 2007, Defendant started a company called Limited X-Ray
Licensure Course Providers, LLC ("Course Providers").  Defendant was the
sole owner, manager and employee of Course Providers and was responsible
for controlling all of its day-to-day operations.

23.    In her response to Plaintiff's Motion for Summary Judgment,
Defendant represented to the Court that she prepared students for both
ARRT and non-ARRT examinations.  There is no evidence to support this
contention.  The evidence overwhelmingly shows that Course Providers
prepared students exclusively for ARRT examinations.

24.    According to the company's Bylaws, Course Providers was
formed "to provide tutoring assistance to qualifying individuals and an
educational support system to those students trying to pass the ARRT
Limited Scope Radiology Exam or ARRT Limited Scope Bone
Densitometry Exam."  (Pl. Ex. 113.)

25.    Defendant created two study guides, one to prepare students for
Plaintiff's Limited Scope examination and one for Plaintiff's BDEO
examination.  (Def. Exs. 1, 2.)  Defendant requested, and received,
permission to reproduce Plaintiff's copyright-protected Limited Scope

Content Specifications and BDEO Content Specifications in the study guides.  Defendant did so because Plaintiff's Content Specifications contain the following notice: "Copyright © 2002 by The American Registry of Radiologic Technologists.  All rights reserved.  Reproduction in whole or part is not permitted without the written consent of The ARRT."

26.     Course Providers offered students two options: a "class option" and a "mail option."  Students who chose the "mail option" received a study guide in the mail.  Students who chose the "class option" received the study guide and were entitled to attend a one-day course.  Course Providers charged students $245.00 for the "class option" and $128.91 for the "mail option."

27.     Course Providers' website marketed Defendant's services to individuals hoping to pass a limited scope radiography examination.  The website stated: "Every state has a different name but the same exam is given in every state by the ARRT (American Registry for Radiologic Technologists) the highest of credentialing agents in the field of radiology." (Pl. Ex. 74.)

28.     The Course Providers website contained a notice that read: "Copyright 2007–2009 © Course Providers.  All rights reserved."  (Pl. Ex. 74.)

29.     In order to identify prospective students, Defendant regularly sent letters to states that use Plaintiff's Limited Scope and BDEO examinations, requesting the names and addresses of individuals who had applied to take the examinations.  Defendant sent letters to state agencies in Arizona, Arkansas, California, Florida, Iowa, Kentucky, Nebraska, and Virginia.  (Pl. Exs. 49, 59, 60, 62, 63, 66, 77, 91, 103, 104, 105, 109, 112.)

30.     When state agencies refused to provide the requested information, Defendant cited to the applicable public records law to obtain disclosure of the information she sought.  (Pl. Exs. 62, 77.)

31.     On at least one occasion, Defendant signed the public records request "Robert Bennett," which is her husband's name.  (Pl. Ex. 62.)

32.     In the letters, Defendant indicated that she provided instruction to individuals taking Plaintiff's Limited Scope and BDEO examinations. Defendant also implied that she was affiliated with ARRT.

33.     For example, Defendant sent a letter to the Kentucky Department for Public Health on January 18, 2007.  The letter stated:

> My name is Diane Wood and I am a course provider for the ARRT Limited Scope Radiology Exam and the ARRT Limited Scope Bone Densitometry Machine Operator Exam.  I am currently under review by the ARRT as an Item Writer and part of their Exam Committee.
>
> We have been researching the success rate of applicants passing the Limited Scope Radiology Exam and our research shows that

12

> your state's success rate average is low.  You average 150
> exams a year, your pass rate average is less than 35%.  We
> would like to request the names and addresses of your
> applicants who are taking the exam in the next 90 days and also
> names and addresses of the applicants who have failed the
> ARRT exam in the past 6 months.  It is our intention to work
> with each applicant individually providing additional
> educational materials so they can have a more successful
> outcome in the future and increase the low success rate
> averages within this state.

(Pl. Ex. 60.)

34.     Defendant was never a member of ARRT's Exam Committee.

35.     The Kentucky Department for Public Health forwarded

Defendant's letter to the ARRT.

36.     On January 31, 2007 Defendant received a letter from Thomas

Kracker, Plaintiff's Assistant Executive Director.  Kracker indicated that

Plaintiff intended to initiate an investigation regarding Defendant's claim

that she was affiliated with ARRT.

37.     On February 5, 2007, Defendant replied to Kracker.  Her letter

stated: "I can see, in retrospect, how the receiver [of my letter] could

misconstrue the relationship between Course Providers and ARRT.  When

stating "WE," I meant Course Providers.  I in no way meant to insinuate a

relationship between Course Providers and ARRT, however I can now see

how the letter could imply such.  My sincere apologies."  Defendant also

13

noted that she would contact all the states she had sent letters to in order to

clear up any confusion.  (Pl. Ex. 64.)

38.    Course Providers, and Defendant, promised to provide students

with questions that appeared on the Examinations.

39.    The Course Providers website stated:

After the ARRT send you your candidate number they will also
send you a "Content Specifications" outline.  This is an outline
of everything you can expect to see on the exam . . . .

We specialize in exam preparation and what we provide is a
tailor made study guide.  This guide follows the ARRT content
specifications exactly, underlined including mock exams with real
questions we have recieved [sic] from previous students who
have taken the exam . . . .

In addition we send you any new questions we get from
students recently taking their exam so you have as many up to
date questions as possible . . . .

(Pl. Ex. 74 (emphasis added).)

40.    In an e-mail to prospective student Rhonda Sims dated July 29,

2007, Defendant wrote:

Additionally we send you more mock exams to practice and
any new questions I get from students who are taking their
exam before you do I will email you as soon as I get them.
After a student that we work with takes their exam they call us
or email us with examples of their test questions and we
incorporate those into the mock exams we give you.  As you
know already, the ARRT has 4 different exams they rotate
through, you will never get the same exam twice so we try to
give you as many examples of what to expect on any one of
those 4 tests.

14

(Pl. Ex. 80 (emphasis added).)  Defendant sent e-mails promising real

examination questions to other prospective students on August 30, 2007,

January 5, 2008, and January 26, 2008.  (Pl. Exs. 81, 84, 96.)

41.     As promised, Defendant actively solicited ARRT examination

questions from students who had recently taken the Examinations.

42.     On January 29, 2008, Anthony Macca ("Macca"), one of

Defendant's students, took the Limited Scope examination.  (Pl. Ex. 54 at

ARRT 001789.)[3]  In an e-mail Defendant sent to Macca that day, she wrote:

---

[3] Defendant moved to strike Plaintiff's Exhibit 54 before trial on the basis
that Plaintiff did not disclose this evidence during discovery.  (Doc. # 75.)
When Plaintiff attached Exhibit 54 to its response to Defendant's Motion to
Strike, Defendant moved to strike Plaintiff's response.  (Doc. # 78.)
Defendant then renewed her objections to Exhibit 54 at trial.
    The Court concludes that Plaintiff's late production of the newly-
produced documents was harmless, and therefore admits Plaintiff's Exhibit
54 into evidence.  In evaluating whether a discovery violation is harmless,
the Court must look to four factors: "(1) the importance of the evidence; (2)
the prejudice to the opposing party of including the evidence; (3) the
possibility of curing such prejudice by granting a continuance; and (4) the
explanation for the party's failure to disclose."  Tex. A&M Research Found.
v. Magna Transp., Inc., 338 F.3d 394, 402 (5th Cir. 2003).  In this case, the
first factor weighs in favor of admission; the newly-produced documents are
"of paramount importance," United States v. Filson, 347 F. App'x 987, 990
(5th Cir. 2009), because they relate directly to one of the key issues at trial:
whether Defendant had access to ARRT's examination questions.  The
second factor also weighs in favor of admission of the newly-produced
documents.  Defendant was not prejudiced by their late disclosure, since
they demonstrate what she already knew or could have discovered: that her
students were taking ARRT examinations.  Defendant would not, therefore,
have benefitted from having these documents long ago.  Finally, Plaintiff has

"I just wanted to check with you to see if you took your exam . . . .  If you . . . have taken your exam please forward any questions to me so that I can forward them to other student's [sic], as you can see, it really helps!"  (Pl. Ex. 42.)  Macca replied: "Hey, thanks for all emails they helped a ton, i took my test today but i can not remember the questions 100%, i wish i could im going to keep trying to peice [sic] them together."  (<u>Id.</u>)  In response, Defendant wrote: "You have GOT TO REMEMBER some questions!  You must!  Sit down right now and call Tina and you both try to come up with some!!!  They do really help!!!  Even if you could just remember the questions, you don't have to remember all the choices!  Email me those as soon as you can!"  (<u>Id.</u>)

43.     On January 8, 2008, Defendant e-mailed Darseth Peraza ("Peraza"), one of her students.  She wrote: "Any questions you can remember after taking your exam please email them so I can pass them onto other students!"  (Pl. Ex. 43.)  Peraza took the Limited Scope examination on December 29, 2008.  (Pl. Ex. 54 at ARRT 001781.)

---

provided an explanation for its failure to disclose the documents earlier. Plaintiff did not believe that they were relevant, because Defendant did not explicitly raise the defense that the questions she solicited were from non-ARRT examinations until recently.  Accordingly, the Court denies Defendant's Motions to Strike.  (Docs. ## 75, 78.)

44.     On September 19, 2008, Defendant sent an e-mail to another student, Adam Brown ("Brown").  She wrote: "I just wanted to check back with you to see how you did on your exam and if there were any questions you can remember that I can pass along to other students currently taking it." (Pl. Ex. 32.)  Brown had taken the Limited Scope examination one month earlier, on August 11, 2008.  (Pl. Ex. 54 at ARRT001477.)

45.     On February 15, 2008, Annie Phillip, one of Defendant's students, sent Defendant an e-mail that stated: "I will try to remember the questions on the exam this time.  I will let you know after taking the test." (Pl. Ex. 75.)  Annie Phillip took the Limited Scope examination on March 5, 2008.  (Pl. Ex. 54 at ARRT001777.)

46.     Defendant succeeded in obtaining ARRT examination questions from students who had already taken the Examinations, and then sent the questions she obtained to students preparing to take the same examination.

47.     On April 29, 2008, Defendant sent Brown an e-mail with eight questions and corresponding answer choices.  "Here are the most recent questions from students just taking it," the e-mail read.  (Pl. Ex. 22.)

48.     On May 29, 2008, Defendant sent Brown and three other students an e-mail containing fourteen questions.  The subject line of the e-

17

mail was "New Questions."   The next day, Defendant e-mailed the same

students with several more questions, noting: "Heard from another student

and here are a few more test questions."  (Pl. Ex. 34.)

49.    On March 13, 2009, Defendant sent Brown an e-mail

containing 82 "New Questions from students taking the exam."  (Pl. Ex. 25.)

50.    Nicole Steinhaus ("Steinhaus") and Frank Paduganan

("Paduganan"), two of Defendant's students, confirmed that Defendant sent

them questions obtained from students who had already taken the

Examinations.  (Pl. Ex. 132, Paduganan Depo. at 13–16, 23, 37–38, 41–42;

Pl. Ex. 133, Steinhaus Depo. at 18–20.)  Steinhaus took the Limited Scope

examination on July 8, 2008, November 22, 2008, and August 15, 2009.  (Pl.

Ex. 54 at ARRT001463–1464).  Paduganan took the Limited Scope

examination on June 14, 2008, August 20, 2008, and November 13, 2008.

(Pl. Ex. 54 at ARRT001456.)

51.    Plaintiff was forced to retire 87 questions from its Test Item

Bank as a result of Defendant's actions.  It costs Plaintiff approximately

$1,000 to develop each question in its Test Item Bank.

52.    Nancy Cavallin ("Cavallin") works for Plaintiff as an Exam

Development Coordinator.  From 2001 to 2009, she was responsible for

developing Plaintiff's Limited Scope examination.

53.     In February 2008, Cavallin attempted to purchase the "class option" from the Course Providers website.  Her purchase was denied, and she received a refund.  (Def. Ex. 8.)  Defendant sent Cavallin an e-mail explaining that Course Providers had refunded her purchase because it was not yet authorized to provide test preparation materials to applicants in her state.  (Def. Ex. 9.)

54.     Defendant testified that she searched the Internet for Cavallin's name when Cavallin attempted to purchase Defendant's course in February 2008, and discovered that Cavallin worked for ARRT.   Defendant claims that this led her to believe ARRT approved of her conduct.  The Court does not find this testimony credible.

55.     Because Cavallin's purchase was denied, she did not obtain access to Defendant's study guides or to the questions Defendant had disseminated by e-mail until they were provided to ARRT during discovery. She recognized many as ARRT questions immediately.

56.     Plaintiff submitted side-by-side comparisons of its examination questions and the questions Defendant disseminated.  The ARRT examination questions and the information Defendant distributed in e-mails contain very similar content.  In most cases, similar words and phrases

appear in the copyrighted work and in the allegedly infringing work, and both works address the same topic.

57.     After Plaintiff filed suit against Defendant, Defendant consulted the resources she used to create her study guides.  She compared the questions she disseminated to her students to questions found in the resources she used, and believes they are similar.  She created a document comparing her questions, ARRT questions, and questions found in other resources.  (Def. Ex. 19.)

58.     Defendant testified that she was "unaware of copyright laws in general" and was not aware that "questions were copyrightable" before this lawsuit was filed against her.  (TR Day 2 at 154:2–5, 168:24.)  The Court does not find this testimony credible.

59.     In June 2009, Defendant removed from the Course Providers website all references to providing students with "real questions," but left the website otherwise intact.  (Id. at 24:5–25.)  Defendant was no longer teaching exam preparation courses, but hoped to continue offering them through Course Providers once this lawsuit was resolved.  (Id. at 25–26.) However, in August 2010, Course Providers filed for bankruptcy.

60.     Around the same time—August 2010—Defendant formed a company called Radiology Course Providers, LLC.  Defendant intends to

20

offer exam preparation courses through Radiology Course Providers, LLC "someday," but currently offers only continuing education courses and radiation safety training.  (Id. at 26:8–13.)

61.     In October 2010, Defendant sent an email to a company that sells educational materials, asking for information about the company's Limited Scope Exam Preparation Course.  (Pl. Ex. 53.)  Defendant signed the email "Abby Montgomery/Assistant" to make it appear as though her company had employees, and indicated that her company had a "board," although it did not, in order to get a better price.  (TR Day 2 at 14–16.)

62.     The Court rejects many of Defendant's self-serving statements because the Court finds that Defendant's testimony generally lacks credibility.  Some of Defendant's testimony was directly contradicted by incontrovertible evidence.  For example, Defendant's testimony that she was unaware of copyright laws until Plaintiff filed suit against her was plainly false in light of the fact that Defendant requested permission to reproduce Plaintiff's copyrighted Content Specifications, and included a notice on the Course Providers website that read "Copyright 2007–2009 © Course Providers."  Evidence adduced at trial also establishes that Defendant has a history of manipulating the truth: she falsely represented to government agencies that she was a member of ARRT's Exam Committee; she testified

21

under oath that she forged her husband's signature on a document sent to a

government agency (TR Day 1 at 95:10–17); and after this lawsuit was filed,

she used a fake name and claimed to have a board of directors when

corresponding with a potential business partner in order to obtain a better

price on a product.  Most troublingly, Defendant submitted a Declaration to

this Court in which she asserted under penalty of perjury that she has never

asked her students or other persons to provide her with actual questions that

appeared on any examination created or administered by Plaintiff.  (Case

No. SA-09-CV-00767-XR, Doc. # 67 Ex. 1 ¶ 8.)  At trial, Defendant

admitted that that statement was "not accurate."  (TR Day 1 at 154:21–22.)

Defendant also pointed out that she submitted an Amended Declaration,

which stated:

> I would like my statement to be amended to, I do not now
> solicit nor have I at any time in the past solicited students or
> other persons to provide me with actual questions.  I have in the
> past however asked students after taking their exam for
> questions concerning factual information, not actual questions.
> The purpose of asking students was to discern the topics on the
> exams and to steer students in the right direction for focusing
> their studies. . . .  [T]he questions I pass along to other students
> do not compromise actual questions from ARRT exams instead
> they are Limited X-Ray Licensure, LLC or Defendants
> recasting of the topics tested into question format . . . .

(Adv. Proc. No. 10-05137-LMC, Doc. # 56 ¶ 2–3.)  This Amended

Declaration was submitted shortly after Plaintiff obtained emails through

third party discovery and a forensic examination of Defendant's computer in which Defendant solicited ARRT examination questions from her students. (See Adv. Proc. No. 10-05137-LMC, Doc. # 44 ¶¶ 2–5.)

## II.     CONCLUSIONS OF LAW

### A.     Defendant's Affirmative Defenses

63.     Defendant argues that Plaintiff's claims are barred by laches and by the doctrine of equitable estoppel.

64.     To establish that Plaintiff's causes of action are barred by laches, Defendant must show: (1) a delay in asserting the rights or claims; (2) that the delay was not excusable; and (3) that the delay caused undue prejudice to Defendant.  Geyen v. Marsh, 775 F.2d 1303, 1310 (5th Cir. 1985).

65.     Defendant points out that in February 2008 when Cavallin attempted to purchase a study guide from the Course Providers website, the website contained language indicating that Defendant sent real ARRT examination questions to students preparing to take the Examinations.  Thus, Defendant reasons, Cavallin must have seen that language and been put on notice of Plaintiff's infringing activity.  That being so, Defendant argues, Plaintiff's failure to bring suit or warn Defendant that her conduct was unlawful caused Defendant undue prejudice.

66.     The Court concludes that Plaintiff's claims are not barred by laches because Defendant failed to establish that Plaintiff was actually aware of Defendant's misconduct in February 2008.  Cavallin testified that she did not recall going to any page on the Course Providers website other than the page on which she attempted to purchase the study guide.  Cavallin's purchase request was denied, so she did not actually obtain access to Defendant's study guides or to the questions Defendant sent to her students. No other witness testified that any employee of ARRT was aware, in February 2008, that Defendant was disseminating ARRT questions to her students.  Dr. Jerry Reid, Plaintiff's Executive Director, testified that in February 2008, ARRT was in the process of investigating Defendant, but did not discover that she was distributing their copyright-protected questions until later in the investigation.  (TR Day 2 at 141–142.)

67.     Defendant's estoppel defense fails for the same reason. Plaintiff's claims are barred under the doctrine of equitable estoppel only if: (1) Plaintiff knew the facts of Defendant's alleged misconduct; (2) Plaintiff intended that its conduct be acted upon or acted in such a way that Defendant had a right to believe that Plaintiff so intended; (3) Defendant was ignorant of the true facts; and (4) Defendant relied on Plaintiff's conduct to its detriment.  Carson v. Dynegy, Inc., 344 F.3d 446, 453 (5th

24

Cir. 2003).  As discussed above, Defendant failed to establish that Plaintiff knew the facts of Defendant's misconduct.

## B.    Copyright Infringement Claim

68.    "A copyright infringement action requires the plaintiff to prove ownership of a valid copyright and copying by the defendant."  Norma Ribbon & Trimming, Inc. v. Little, 51 F.3d 45, 47 (5th Cir. 1995).

69.    The first element—ownership of a valid copyright—is established by proving the originality and copyrightability of the material and compliance with statutory formalities.  Allied Mktg. Grp., Inc. v. CDL Mktg., Inc., 878 F.2d 806, 811 (5th Cir. 1989).

70.    On April 11, 2013, this Court issued an Order: (1) Denying Defendant's Motion for Summary Judgment; (2) Denying Plaintiff's Cross-Motion for Summary Judgment; (3) Denying Defendant's Motion for Sanctions/Contempt; and (4) Denying Defendant's Motion for Sanctions ("Order Denying Summary Judgment").  (Doc. # 61.)  In the Order Denying Summary Judgment, the Court held that Plaintiff owns a valid copyright in the questions contained in its Test Item Bank.  (Id. at 13.)  The Court noted that Plaintiff's Certificate of Registration constitutes prima facie evidence of the validity of the copyright, 17 U.S.C. § 410(c), and found that Defendant failed to rebut the presumption of validity.  (Id. at 8–13.)  The Court rejected

25

Defendant's argument that Plaintiff owns a copyright only in the compilation of examination questions (i.e., the Test Item Bank in its entirety) and  not in the questions themselves.  (<u>Id.</u> at 10.)

71.    The second element of a copyright infringement claim—actionable copying—is established by proving that: (1) the alleged infringer actually copied the copyrighted material (often referred to as "factual copying"); and (2) substantial similarity exists between the copyrighted work and the allegedly infringing work.  <u>See</u> <u>Bridgmon v. Array Sys. Corp.</u>, 325 F.3d 572, 575 (5th Cir. 2003).

72.    "As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity."  <u>Peel & Co., Inc. v. The Rug Mkt.</u>, 238 F.3d 391, 394 (5th Cir. 2001).  "[A]ccess through a third party is legally sufficient."  <u>Kepner-Tregoe, Inc. v. Leadership Software, Inc.</u>, 12 F.3d 527, 533 n.6 (5th Cir. 1994) (quoting <u>Arica Inst., Inc. v. Palmer</u>, 970 F.2d 1067, 1074 (2d Cir. 1992)); <u>see also</u> <u>Kamar Int'l, Inc. v. Russ Berrie & Co.</u>, 657 F.2d 1059, 1062 (9th Cir. 1981) ("[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant. . . .") (quoting 3 Nimmer on Copyright,

26

§ 13.02(A) at 13–11 (1981)).  Two works are probatively similar if there are

"any similarities between the two works (whether substantial or not) that, in

the normal course of events, would not be expected to arise independently in

the two works and that therefore might suggest that the defendant copied

part of the plaintiff's work."  Positive Black Talk Inc. v. Cash Money

Records Inc., 394 F.3d 357, 370 (5th Cir. 2004), abrogated on other grounds

by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010).

73.     Based on the factual findings set forth above, the Court

concludes that Defendant actually copied Plaintiff's copyrighted questions.

74.     The evidence demonstrates that Defendant had access to

Plaintiff's questions through her students.  Defendant solicited ARRT

examination questions from students who had recently taken the

Examinations, and her students complied.  The e-mails she sent to students

preparing to take the Examinations contained questions Defendant described

as "New Questions from students taking the exam."  (Pl. Ex. 25.)  Since all

of Defendant's students took, or were preparing to take, ARRT

examinations, the questions she disseminated could not have come from any

source other than an ARRT examination.

75.     The evidence also demonstrates that the questions Defendant

disseminated are probatively similar to the ARRT questions Defendant is

27

accused of copying.  Plaintiff's side-by-side comparisons show that

Defendant's questions are too similar to ARRT's examination questions for

the similarities to have arisen independently.  For example, in several

instances Defendant's question includes the same <u>wrong</u> answer choices as

the corresponding ARRT question.  In other cases, Defendant's question

correctly describes a drawing or an x-ray as it appears in Plaintiff's Test

Item Bank.

76.     For factual copying to be legally actionable, there must be

substantial similarity between the original work and the copy.  <u>See</u> <u>Creations</u>

<u>Unlimited, Inc. v. McCain</u>, 112 F.3d 814, 816 (5th Cir. 1997).

77.     "[A] side-by-side comparison must be made between the

original and the copy to determine whether a layman would view the two

works as 'substantially similar.'"  <u>Id.</u>; <u>see</u> <u>also</u> <u>Nihon Keizai Shimbun, Inc.</u>

<u>v. Comline Bus. Data, Inc.</u>, 166 F.3d 65, 70 (2d Cir. 1999) ("The standard

test in determining substantial similarity is the 'ordinary observer test':

whether an average lay observer would overlook any dissimilarities between

the works and would conclude that one was copied from the other.").

78.     Plaintiff's side-by-side comparisons establish that many of the

questions Defendant disseminated are substantially similar to ARRT's

copyrighted questions.  For example, one of the copyrighted questions in

Plaintiff's Test Item Bank asked:

> According to the NCRP (National Council on Radiation
> Protection and Measurements), which of the following has the
> highest occupational radiation exposure limit?
>
> a.  thorax
> b.  head
> c.  hands
> d.  trunk
>
> Answer: c.

Defendant disseminated a question that read:

> Which can handle the most radiation according to the NCRP?
> Torso, Head, <u>Hand</u>.

79.     Although not identical, the copyrighted question and the

infringing question are substantially similar.  <u>Educ. Testing Servs. v. Simon</u>,

95 F. Supp. 2d 1081, 1088 (C.D. Cal. 1999) ("Substantial similarity does not

require verbatim copying; a coaching school cannot escape copyright

liability by claiming that its copying of secure test questions is not word-for-

word.").  Both ask the very same question, and the infringing question

effectively lists the same correct and incorrect answer choices as the

copyrighted question.  A lay observer would overlook the dissimilarities and

conclude that Defendant's question was copied from Plaintiff's examination.

80.     The fact that Defendant copied, at most, less than 100 questions from the many thousands contained in Plaintiff's Test Item Bank does not excuse the infringement.  See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564–65 (1985) ("[A] taking may not be excused merely because it is insubstantial with respect to the infringing work."); Educ. Testing Servs. v. Katzman, 793 F.2d 533, 542–43 (3d Cir. 1986) (holding that the copying of even a few questions out of thousands justified a preliminary injunction where the qualitative value of the material, to both the originator and the plagiarist, was high).

81.     Defendant infringed Plaintiff's copyright in its Test Item Bank.

**Damages**

82.     Plaintiff seeks statutory damages.  Section 504(c) of the Copyright Act provides that a

> copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work . . . in a sum of not less than $750 or more than $30,000 as the court considers just.

17 U.S.C. § 504(c)(1).  "[A]ll the parts of a compilation or derivative work constitute one work."  17 U.S.C. § 504(c)(1); see also Bryant v. Media Right Prods., Inc., 603 F.3d 135, 141 (2d Cir. 2010) ("[A]ll parts of a compilation

30

must be treated as one work for the purpose of calculating statutory damages.").

83.    "[S]tatutory damages are to be calculated according to the number of works infringed, not the number of infringements." Walt Disney Co. v. Powell, 897 F.2d 565, 569 (D.C. Cir. 1990). Accordingly, where, as here, there are multiple infringements of one compilation, the copyright owner is entitled to one award of statutory damages.

84.    If the copyright owner proves, and the Court finds, that infringement was committed willfully, the Court may in its discretion increase the award of statutory damages to a sum of not more than $150,000. 17 U.S.C. § 504(c)(2).

85.    "Willfulness is shown where the infringer was provided with oral or written notice of its transgression of the copyright," or "where the defendant has recklessly disregarded the plaintiff's rights, or upon a showing that the defendant knew or should have known it infringed upon a copyrighted work." Lance v. Freddie Records, Inc., 986 F.2d 1419, at *2 (5th Cir. 1993) (unpublished table decision). For infringement to be "willful" within the meaning of the statute, it must be done "with knowledge that the . . . conduct constitutes infringement," not merely with an "intent to copy." Princeton Univ. Press v. Mich. Document Servs., Inc., 99 F.3d 1381,

31

1392 (6th Cir. 1996) (quoting 3 Nimmer on Copyright, § 14.04[B][3] (1996)).

86.     The Court concludes that Defendant committed infringement willfully.  Based on the evidence adduced at trial, the Court finds that Defendant was aware that Plaintiff's questions were copyright protected.

87.     Furthermore, even if Defendant had not been aware that Plaintiff's questions were protected by copyright, her actions would have betrayed a reckless disregard for the rights Plaintiff has in its questions.  As the provider of an exam preparation course, Defendant must have, or should have, known that her conduct was improper—her contract with Plaintiff expressly prohibited it, and, as Plaintiff points out, "basic common sense" dictates that cheating is wrong.  Furthermore, Defendant was not unfamiliar with the law in general, as evidenced by her ability to cite to applicable laws in order to obtain access to public records from state agencies.  Defendant was also familiar with copyright laws specifically, as evidenced by the fact that she requested permission to reproduce Plaintiff's Content Specifications.  The fact that Plaintiff's Content Specifications—which contain less sensitive and secure information than the Examinations—are protected by copyright should have signaled to Defendant that the questions themselves are also protected.  An online search of the United States

32

Copyright Office's Public Catalog would have revealed that Plaintiff's Test Item Bank—and each of its test forms—is copyright-protected.  These factors, together, compel the conclusion that Defendant recklessly disregarded Plaintiff's rights.  See Nat'l Bd. of Med. Exam'rs v. Optima Univ. LLC, No. 1:09-CV-01043, 2011 WL 7615071, at *9 (W.D. Tenn. Sept. 29, 2011) (holding that the owner of a preparation course company either knew or acted in reckless disregard of the fact that medical licensing examination questions were copyrighted and reproducing them was unlawful); Fallaci v. New Gazette Literary Corp., 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983) (holding that the publisher of a copyrighted newspaper should have been aware that its unauthorized republication of an article from the Washington Post constituted copyright infringement).

88.    The Court has broad discretion to set the amount of statutory damages within the minimum and maximum amounts prescribed by the Copyright Act.  Nat'l Football League v. PrimeTime 24 Joint Venture, 131 F. Supp. 2d 458, 472 (S.D.N.Y. 2001).  This "broad discretionary power given courts to make such an award serves the dual purposes of the Copyright Act: to compensate copyright owners and to provide a deterrent for would-be infringers."  Id. (quoting Schwartz-Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106, 108 (S.D.N.Y. 1992)).

89.     Based on the Court's finding of willfulness, the Court may award up to $150,000 in statutory damages to Plaintiff.  The Court concludes that Plaintiff is entitled to an award of $87,000.  Defendant willfully distributed Plaintiff's copyright-protected questions for profit. Defendant's actions threatened the interests of a number of groups: state licensing boards, which rely on the integrity of ARRT Examinations for state licensing purposes; the general public, which relies on the examination results as an indicator of the examinee's competence; and other examinees, who are entitled to assurance that no other examinee enjoys an unfair advantage.  See Nat'l Council of Exam'rs for Eng'g & Surveying v. Cameron-Ortiz, 626 F. Supp. 2d 262, 267 (D.P.R. 2009).  Defendant's conduct also threatened Plaintiff's interest in protecting not only its intellectual property but also its reputation by ensuring that the information it provides is reliable.  See Murray v. Educ. Testing Servs., 170 F.3d 514, 517 (5th Cir. 1999) ("ETS has the right to protect its own reputation by assuring the reliability of the information it provides.").  Finally, as a result of Defendant's actions, Plaintiff was forced to retire 87 questions, each of which cost Plaintiff approximately $1,000 to develop.  Accordingly, $87,000 will compensate Plaintiff for the injuries it sustained.  It will also serve to deter Defendant—who intends to resume teaching exam preparation courses

once this lawsuit is resolved—from committing misconduct of this sort again.

## Attorney's Fees

90.     Pursuant to Section 505 of the Copyright Act, the Court is authorized to award costs and attorney's fees to the prevailing party.  17 U.S.C. § 505.  In the Fifth Circuit, "an award of attorney's fees to the prevailing party in a copyright action, although left to the trial court's discretion, 'is the rule rather than the exception and should be awarded routinely.'"  Positive Black Talk, 394 F.3d at 380 (quoting McGaughey v. Twentieth Century Fox Film Corp., 12 F.3d 62, 65 (5th Cir. 1994)).  However, "recovery of attorney's fees is not automatic."  Virgin Records Am., Inc. v. Thompson, 512 F.3d 724, 726 (5th Cir. 2008).

91.     The Supreme Court has noted that there is no "precise rule or formula" for determining whether to award attorney's fees.  Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994) (quoting Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)).  Considerations that may guide a court's discretion include the need for compensation and deterrence; the relative financial strength of the parties; the amount of damages at stake; and whether the party acted in bad faith.  Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986).  "In the district court's discretion, fees need not be awarded

35

if the award would not vindicate underlying statutory policies or it would be inequitable." Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1127 (2d Cir. 1989).

92. The Court concludes that Plaintiff is entitled to recover its reasonable attorney's fees and costs. The relative financial strength of the parties counsels against awarding costs and attorney's fees to Plaintiff. However, other considerations strongly weigh in favor of an award.

93. An award is warranted to compensate Plaintiff for years of avoidable litigation. Plaintiff was compelled to initiate the lawsuit because of Defendant's willful and egregious copyright infringement, and Defendant's bad-faith litigation tactics prolonged it unnecessarily. For example, during discovery, Plaintiff sought all documents relating to Defendant's communications with her students. Defendant did not comply with Plaintiff's discovery requests; she failed to turn over emails in which she asked her students to send her questions from ARRT examinations. Plaintiff was forced to file a motion to compel a forensic examination of Defendant's computers, which the Court granted (Case No. SA-09-CV-00767-XR, doc. # 90). Defendant filed bankruptcy, and the case was stayed before the forensic examination could take place. Plaintiff renewed its motion to compel a forensic examination before the Bankruptcy Court, and

again the motion was granted.  (Adv. Proc. No. 10-05137-LMC, Doc. # 64.)

Defendant nevertheless refused to comply, and Plaintiff was forced to file a

motion to compel compliance with the Court's Order.  (Adv. Proc. No. 10-

05137-LMC, doc. # 76.)  Furthermore, this case proceeded to trial solely as a

result of Defendant's misrepresentations to the Court.  The Court denied

Plaintiff's Motion for Summary Judgment because Defendant asserted, in

her response, that she taught students preparing to take non-ARRT

examinations.  The evidence at trial established that this assertion was false,

and that Defendant knew it to be false when she made it.

94.     An award of costs and attorney's fees will also serve the goal of

deterrence.  Defendant testified that she intends to resume teaching exam

preparation courses when this case is resolved.  Her conduct while litigating

the instant action indicates that she does not recognize that her conduct was

unlawful, and is willing to lie to avoid liability.  However, an award of

attorney's fees may serve to deter her from engaging in unlawful conduct in

the future.

95.     Accordingly, Plaintiff is directed to file a motion for its

reasonable attorney's fees and costs incurred in litigating this matter within

fourteen (14) days of the date of this Order.  Defendant shall have fourteen

(14) days to file objections.  The Court shall decide the amount of fees and costs to be awarded on the basis of the parties' submissions.

## Dischargeability of Defendant's Debt

96.     In September 2010, after Plaintiff initiated this lawsuit, Defendant filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.  Plaintiff argues that the debt Defendant owes to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

97.     Section 523(a)(6) of the Bankruptcy Code provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable under the Bankruptcy Code. 11 U.S.C. § 523(a)(6).

98.     In Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998), the Supreme Court held that nondischargeability under § 523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  In other words, a debt is nondischargeable only if it arises from an act committed with the intent to cause injury.  Id.

99.     The Fifth Circuit has interpreted Kawaauhau to mean that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  In re Miller, 156 F.3d 598, 606 (5th Cir. 1998).  Thus, a debt is dischargeable if the plaintiff's

injury was either intentionally inflicted or certain to occur when the debtor committed the injurious act.  In re Williams, 337 F.3d 504, 509 (5th Cir. 2003) ("The dischargeability of Williams's two debts to the Union, therefore, depends upon the intentional or certain nature of the injury Williams inflicted upon the Union when he breached the [contract].").

100.    The Court has found that Defendant willfully infringed Plaintiff's copyright.  An act of willful infringement necessary qualifies as an act committed with the intent to cause injury: since "copyright infringement is a categorically harmful activity," harm is certain to follow from a willful act of infringement.  In re Braun, 327 B.R. 447, 451 (Bankr. N.D. Cal. 2005); see also In re Smith, No. EC-009-1117, 2009 WL 7809005, at *9 (9th Cir. BAP Dec. 17, 2009) ("[I]ntentional infringement is tantamount to intentional injury under [§ 523(a)(6)] . . . .  It is impossible to separate the 'conduct' of trademark infringement from the 'injury' of trademark infringement when considering the defendant's intent."); In re Ahmed, 359 B.R. 34, 39 (Bankr. E.D.N.Y. 2005) (finding that debt was nondischargeable where district court had previously determined that infringement was committed willfully for purposes of enhanced statutory damages award).

101.     Moreover, even if Defendant had not been aware that Plaintiff's questions were copyrighted, harm was <u>certain</u> to occur when she sent ARRT examination questions to students preparing to take the Examinations. Cheating is, by its very nature, harmful.  Examinations are meant to assess the knowledge, aptitude, or ability of examinees.  Cheating distorts the results of an examination—indeed, is <u>intended</u> to distort the results—and therefore diminishes its value as an assessment tool.  Defendant's conduct was designed to help possibly unqualified individuals obtain state licenses. It therefore undercut the value of state licensure and endangered Plaintiff's reputation among states that rely on the Examinations as an appropriate measure of an individual's knowledge in a particular area.

102.     Accordingly, Defendant's debt is nondischargeable under § 523(a)(6).

## C.     Breach of Contract Claim

103.     Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach."  <u>Wright v. Christian & Smith</u>, 950 S.W.2d 411, 412 (Tex. App. 1997).

104.    In the Court's Order Denying Summary Judgment, the Court held that there was no dispute as to the existence of a valid contract between Plaintiff and Defendant.  (Doc. # 61 at 23–24.)  By signing Plaintiff's Application annually, Defendant agreed to be bound by the terms of Plaintiff's Governing Documents, including Plaintiff's Standards of Ethics.

105.    In the Court's Order Denying Summary Judgment, the Court also concluded that there was no dispute that Plaintiff performed by renewing Defendant's registration annually.  (Doc. # 61 at 25.)  Defendant now asserts that Plaintiff did not perform its obligations under the contract because it did not notify Defendant that her conduct violated the ARRT's Standards of Ethics.  This argument fails.  ARRT's Standards of Ethics do not require Plaintiff to notify a registered technologist if he or she violates the Standards of Ethics.  In fact, the Standards of Ethics explicitly state:

> Conduct that violates the ARRT's Rules of Ethics may also violate applicable state or federal law.  In addition to the potential sanctions under the Standards of Ethics, the ARRT may, without giving prior notice, pursue civil and/or criminal penalties against the Registered Technologist . . . .

(Def. Ex. 10 at 4.)  Defendant does not argue that Plaintiff failed to perform in any other way.

106.    Based on the factual findings set forth above, the Court now concludes that Defendant breached her contract with Plaintiff.  Defendant

41

agreed to be bound by Plaintiff's Standards of Ethics, which prohibit, among other things, "disclosing information concerning any portion of a future, current, or previously administered examination of ARRT," and "using or purporting to use any portion of examination materials which were obtained improperly or without authorization for the purpose of instructing or preparing any applicant for examination."  Plaintiff clearly violated these provisions by soliciting questions from examinees and disseminating the questions she obtained to students preparing to take the Examinations.

107.    The Court also concludes that Defendant's breach caused Plaintiff to suffer actual damages.  Plaintiff was forced to retire 87 questions from its Test Item Bank as a result of Defendant's breach.  The evidence presented at trial established that the direct cost of developing each question is approximately $1,000.  Thus, Plaintiff lost the value of approximately $87,000 of its investment as a result of Defendant's actions.

108.    Accordingly, the Court finds that Defendant is liable for breaching her contract with Plaintiff.

**D.    Tortious Interference Claim**

109.    To prevail on a claim for tortious interference, a plaintiff must establish: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused

the plaintiff's injury, and (4) caused actual damages or loss." <u>Prudential Ins.</u>
<u>Co. of Am. v. Fin. Review Servs., Inc.</u>, 29 S.W.3d 74, 77 (Tex. 2000).

110.    Plaintiff requires every individual sitting for an ARRT
examination to enter into a non-disclosure agreement, which states that
examinees are "expressly prohibited from disclosing, publishing,
reproducing, or transmitting this exam, in whole or in part, in any form or by
any means, verbal or written, electronic or mechanical, for any purpose,
without the prior express written permission of ARRT."  Examinees cannot
proceed to the examination until they click a button indicating that they
accept the terms of the Agreement.  Thus, the Court concludes that Plaintiff
has a contractual relationship with each examinee.

111.    The Court concludes that the evidence submitted at trial also
establishes that Defendant willfully and intentionally interfered with that
contractual relationship by asking her students to disclose questions they
saw on the Examinations.

112.    Defendant argues that she did not have the requisite intent
because she was not aware that her students entered into a non-disclosure
agreement with Plaintiff.  <u>See</u> <u>Amigo Broad., LP v. Spanish Broad. Sys.,</u>
<u>Inc.</u>, 521 F.3d 472, 490 (5th Cir. 2008) ("[T]he interfering party must have
'actual knowledge of the contract or business relation in question, or

43

knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship.'"). The Court does not find this claim credible. Plaintiff's Examination Handbook notifies candidates that they will be asked to enter into a non-disclosure agreement and must accept the terms of the agreement in order to proceed with the examination. The Examination Handbook states that by entering into the Agreement, candidates "agree to not disclose exam questions in any form or remove them from the test center." (Pl. Ex. 9a at ARRT 000474.) Defendant was familiar with and had access to the Examination Handbook—it contains the Content Specifications that Defendant reproduced in her own study guides. Thus, Defendant "knew or in the exercise of ordinary care should have known" that her students entered into a non-disclosure agreement with Plaintiff. Steinmetz & Assocs., Inc. v. Crow, 700 S.W.2d 276, 278 (Tex. App. 1985).

113.   As for the third element of a tortious interference claim, "[t]o establish proximate cause, a [plaintiff] must show that 'the defendant took an active part in persuading a party to a contract to breach it.'" Amigo Broad., LP, 521 F.3d at 493 (quoting Davis v. HydPro, Inc., 839 S.W.2d 137, 139 (Tex. App. 1992)). Defendant actively persuaded her students to disclose questions they saw on the Examinations; as a result, Plaintiff was

forced to retire 87 questions.  Accordingly, Defendant's interference

proximately caused Plaintiff's injury.

114.    Finally, Plaintiff suffered actual loss.  As a result of

Defendant's conduct, Plaintiff lost the value of 87 questions, which each

cost approximately $1,000 to develop.  See Cameron-Ortiz, 626 F. Supp. 2d

at 269 ("In a case such as this, involving the infringement of secure

standardized test questions, the loss in fair market value is appropriately

calculated by determining the development costs for any infringed questions

and infringed forms that are retired because of the compromise.").

115.    The Court finds that Defendant is liable for tortious

interference.

## E.    Misappropriation of Trade Secrets Claim

116.    Under Texas law, misappropriation of trade secrets is

established by showing: "(a) a trade secret existed; (b) the trade secret was

acquired through a breach of a confidential relationship or discovered by

improper means; and (c) use of the trade secret without authorization from

the plaintiff."  Phillips v. Frey, 20 F.3d 623, 627 (5th Cir. 1994).

117.    In the Court's Order Denying Summary Judgment, the Court

held that Plaintiff's examination questions constitute trade secrets.  (Doc.

# 61 at 32.)

118.    Based on the factual findings set forth above, the Court concludes that Defendant improperly acquired Plaintiff's questions. "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 876 (5th Cir. 2013) (quoting Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223 S.W.3d 616, 636 (Tex. App. 2007)). Defendant acquired Plaintiff's confidential, copyright-protected questions by inducing her students to violate the non-disclosure agreements they entered into.

119.    Finally, Defendant used Plaintiff's questions without authorization.  "Use" is defined as "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant."  Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 451 (5th Cir. 2007) (quoting Restatement (Third) of Unfair Competition § 40). Defendant solicited students (customers) by promising to provide them with questions that appeared on the Examinations, and did, in fact, provide her students with questions that appeared on the Examinations.  She was not authorized to do so.

46

120.    The Court finds that Defendant is liable for misappropriation of trade secrets.

ORDER

Based on the foregoing findings of fact and conclusions of law, the Court orders that judgment be entered in favor of Plaintiff and against Defendant in the amount of $87,000.  Plaintiff is directed to file a motion for its reasonable attorney's fees and costs incurred in litigating this matter within fourteen (14) days of the date of this Order.  Defendant shall have fourteen (14) days to file objections.  The Court shall decide the amount of fees and costs to be awarded on the basis of the parties' submissions.

IT IS SO ORDERED.

DATED:  San Antonio, Texas, August 26, 2013.

_____
David Alan Ezra
Senior United States District Judge